# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
# MARTINSBURG

**WEST VIRGINIA SCHOOLS FOR**
**THE DEAF AND BLIND,**

    Plaintiff,

v.                                           Civil Action No. 3:11-CV-38
                                                  (GROH)

**A.V., a minor, DARREN V. and STACY V.,**
**parents of A.V.,**

    Defendants.

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

### I. Introduction

On this day, the above-styled matter came before the Court for consideration of the Plaintiff's and Defendants' cross-motions for summary judgment [Docs. 14 and 17] with respect to the Plaintiff's Complaint [Doc. 4]. In its Complaint, Plaintiff West Virginia Schools for the Deaf and Blind ("WVSDB") prays for review and reversal of a decision rendered by a due process hearing officer pursuant to 20 U.S.C. § 1415. The Defendants argue that the hearing officer's decision should be affirmed.

### 2. Factual Background

"[F]indings of fact by the hearing officers in [cases arising under the federal Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*], are entitled to be considered *prima facie* correct . . . [and] if [the district court] is not going to follow them, [it] is required to explain why it does not." ***Doyle v. Arlington County Sch. Bd.***, 953

F.2d 100, 105 (4th Cir. 1991). There having been no serious challenge made to the hearing officer's factual findings in the case *sub judice*, the Court hereby adopts them for the purposes of this decision.

A.V. is a female child, approximately nine years old, who has been enrolled at WVSDB since 2006. A.V. was diagnosed in 2006 with apraxia of speech, and she also has a history of recurrent otitis media and chronic rhinorrhea. An audiogram performed in 2005 suggested a possible mild hearing loss in her right ear. Audiograms taken more recently in March 2006, September 2006, and March 2010 failed to disclose any significant hearing loss.

In the Fall of 2008, the West Virginia Department of Education ("WVDE") monitored WVSDB. As a consequence of the monitoring, WVDE directed WVSDB to exit students who no longer met the eligibility criteria for hearing impairment or visual impairment. On November 30, 2009, James Brown of the WVDE Office of Assessment, Accountability, and Research, instructed WVSDB's Superintendent that "[p]rior to the 2010-2011 school year, the WVSDB will transition any student who will be in grades K-4 during the 2010-2011 school year and are deemed as having a primary disability not included in the provisions delineated in West Virginia School Law Section 18-7-2 to their home district; . . ." This mandated action was characterized as a correction of a legal noncompliance on the part of WVSDB.

A.V.'s most recent Individualized Educational Program document ("IEP") bears the date of October 21, 2010, on its first four and final pages (i.e. pages 1-4; 13). Pages 5-12 bear the dates of either April 22, 2010, or May 22, 2010. The October 2010 IEP is an amalgam of an IEP document created and completed in the Spring of 2010, and later

modified in October 2010.  The modification in October 2010 was performed for the express purpose of removing A.V. from WVSDB and transitioning her to her home county school district after it was determined that A.V. did not meet the eligibility criteria as a deaf student.  The Hampshire County, West Virginia public school system is A.V.'s home county school district, because she and her parents reside in Hampshire County.  WVSDB is also located in Hampshire County.

A.V. has been identified as a student eligible for Special Education under the category of Speech/Language Impairment.  It has not been contested that A.V. is receiving a high-quality education at WVSDB.  Her failure to qualify as a student with a hearing loss is the sole reason she is to be removed from her current enrollment at WVSDB.  No other programmatic or functional needs assessment was administered.

A.V. has multiple impairments and challenges.  Notably she has apraxia of speech ("verbal apraxia").  Verbal apraxia is a speech disorder in which a person has trouble saying what he or she wants to say, correctly and consistently.  This makes A.V.'s speech difficult to understand without careful listening.  Children with apraxia tend to make inconsistent mistakes when speaking.  They have trouble putting sounds and syllables together to form words. Longer and more complex words may be problematic.  They may be able to say a word or a sound one time and have trouble reproducing it later.  They may appear to be groping for the right word or sound.  Another characteristic of apraxia is difficulty with prosody (i.e. the rhythms, stresses, and inflections of speech). Children with developmental apraxia of speech do not outgrow it on their own, but require individualized therapy.  It is recognized that in severe cases, people with apraxia of speech may need to use means, other than speech, to express themselves effectively.

The National Institutes of Health characterize both apraxia of speech and deafness as communication disorders. A.V.'s communication problems appear to be both receptive and expressive. Receptively, A.V. requires that questions be presented to her in multiple ways. She also requires waiting time so that she can process a question and then answer. She requires hands-on activities, and a great deal of repetition. With material involving numbers, the use of sign language has been useful to A.V. to help her determine number sequence and avoid transpositional errors.

A.V.'s physician, an associate professor of pediatrics and neurodevelopmental disabilities at the University of Virginia, has opined that A.V. needs intensive speech therapy four to five times per week, and also a "total communication environment," including spoken words, signs, pictures, and assistive technologies.

A.V.'s IEP documents of April 22, 2010, and October 21, 2010, incorporate most of her physician's suggestions, including a total communication environment for all classroom, extracurricular, and non-academic activities. Both IEPs indicate that a total communication environment (i.e. spoken and non-spoken communication modes) are "needed by this student for accurate receptive and expressive communication and learning tasks." The IEPs also indicate that she needs a small group setting and intensive speech therapy.

The latest IEP, with cover sheet dated October 21, 2010, indicates internally that ***all*** of A.V.'s services are to be given in a special education environment. This is in direct conflict with the amended placement sheet on the same document, which indicates she will be in a general education setting ninety-six percent of the time, and in a special education setting only four percent of the time.

In addition to her verbal apraxia, A.V. also has global developmental delays, static

4

encephalopathy, motor apraxia, and neuromotor dysfunction characterized by moderate hypotonia (i.e. poor strength in her core body muscles). This causes functional problems with motor and praxis skills as well as sensory perceptual skills. The significant weakness in A.V.'s trunk causes postural and gross motor problems. She exhibits gravitational insecurity. Her balance and coordination need improvement. A.V.'s Occupational Therapist has stated that she has difficulty forming written letters legibly. During an evaluation in April 2010, approximately seventy percent of A.V.'s letters were legible, while thirty percent of her letters were illegible. A.V. was noted to have problems with postural control, fine motor dexterity, upper extremity strength and stability, eye to hand coordination, proprioception (i.e. perceiving the placement of her body parts in space), and visual perceptual skills. She has laxity in her joints and muscles as well as Lordosis in her back. In combination, the laxity and Lordosis create problems for A.V. with balance and posture when walking or sitting. Motor planning delays cause her difficulties with any new physical activity.

A.V.'s Speech Language Services provider noted that A.V. does not speak in the presence of people she does not know well or in new places. A.V.'s classroom teacher reported A.V. has a tendency to exhibit shyness and withdraw in strange environments.

At WVSDB, A.V. is educated in a special education classroom with less than four other students. In the proposed county school system regular education setting, A.V. could expect to be in a classroom of approximately seventeen to nineteen students of various academic abilities. A.V.'s reading teacher has opined that placing A.V. in a class with seventeen to nineteen students "definitely would be very detrimental to her."

A.V.'s IEP from the Spring of 2010 (dated April 22, 2010, and May 22, 2010), which

her parents approved, and which was implemented for A.V. at WVSDB, is a document containing thirteen pages. Although out of their original order, eight of the pages from her Spring 2010 IEP were also incorporated into her October 21, 2010, IEP. Specifically, the incorporated pages are pages 4-6 and 8-12. The October 2010 IEP omitted the following sections from the Spring 2010 IEP: Student Information, Part I, Documentation of Attendance, Part II, and Consideration of Factors for IEP Development/Annual Reviews, Part III. All of these items were redrafted in the October 21, 2010 IEP, at pages 1 and 3.

Missing from the October 21, 2010 IEP is page 3 of the Spring 2010 IEP, which contained Present Levels of Academic Achievement and Functional Performance, including a narrative statement of A.V.'s academic accomplishments and challenges up to that time. Corresponding information is nowhere to be found in the October 2010 IEP.

Also missing from the October 21, 2010 IEP is information corresponding to the material contained on page 7 of the April 22, 2010 IEP. On that sheet were Annual Goals and Objectives for reading, writing, spelling, grammar, and mathematics, all of which were to be implemented in a total communication setting and special education environment. There are no goals and objectives for academic subjects in the October 21, 2010 IEP.

In spite of a lack of relevant goals and objectives, all academic classes are noted on the October 21, 2010 IEP as being implemented in a special education environment. According to the services section of the October 21, 2010 IEP (Part IV), A.V.'s reading/language arts, math, science, social studies, and developmental reading delivery will require a total of 1,500 minutes (25 hours) per week, all to be implemented in a Special Education Environment ("SEE"). This is inconsistent with page 2 of the same document, which indicates A.V. will be out of the general education setting only when receiving her

6

related services of occupational therapy, speech therapy, and physical therapy, for a total of four percent of the school hours.

It is uncontested that WVSDB has the capacity to provide A.V. with a total communication environment, involving the utilization of both spoken words and sign language by all educational personnel and students at the school. The county school's speech therapist indicated that total communication and sign language support were available at the county school, although she admitted that she does not know what is provided at WVSDB. However, the testimony elicited at the administrative hearing indicated the county speech therapist at best would only be able to work with A.V. sixty minutes per week. Given this testimony, the county school could provide A.V. with a total communication environment for a small portion of the school day once a week. The county school district's Special Education Director reported the county typically would not use American Sign Language as part of their speech language approach.

### 3. Procedural History

A.V. filed a request for a due process hearing pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*, on October 28, 2010, in order to contest the transfer of A.V. from WVSDB to Hampshire County's Capon Bridge Elementary School. A hearing was held before a Due Process Hearing Officer on February 1, 2011. A.V., by her parents, appeared *pro se*. The WVDE/WVSDB was represented by counsel. On March 15, 2011, the Hearing Officer issued a decision granting the relief prayed for by A.V. and directing that A.V. should be permitted to remain in her present educational placement program at WVSDB. [Doc. 13 at 4-31]. On May 12, 2011, WVSDB appealed the Hearing Officer's decision by filing a Complaint with this Court. [Doc. 4]. This

Court thereafter entered a scheduling order directing the filing of cross-motions for summary judgment. Both cross-motions are now ripe for adjudication.

4. Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

5. Standard of Review

Pursuant to 20 U.S.C. § 1415(i)(2), any party aggrieved by the findings and decisions of a due process hearing officer pursuant to the IDEA shall have the right to bring a civil action in a district court of the United States. In any such action, the Court: (1) shall receive the records of the administrative proceedings; (2) shall hear additional evidence at the request of a party; and (3) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate. 20 U.S.C. § 1415 (i)(2)(C).

"In a judicial proceeding under the IDEA, a reviewing Court is obliged to conduct a modified *de novo* review, giving 'due weight' to the underlying administrative proceedings." **Board of Educ. v. Rowley,** 458 U.S. 176 (1982); **MM ex rel. DM v. School Dist. of Greenville County,** 303 F.3d 523 (4th Cir. 2002). "[T]he court's role in reviewing the administrative proceeding concerning IDEA 'is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities they review.'" **Rowley,** 458 U.S. at 206. Although findings of fact made in administrative proceedings are considered to be *prima facie* correct, in giving these factual findings their

due weight, the district court is free to decide the case on a preponderance of the evidence. ***A.B. v. Lawson,*** 354 F.3d 315 (4th Cir. 2004); ***Doyle v. Arlington County Sch. Bd.,*** 953 F.2d 100 (4th Cir. 1991). Thus, the district court is bound by the administrative record and additional evidence before the court but is free to make its own independent decision. ***Doyle,*** 953 F.2d at 105.

6. Discussion

### a. The October 21, 2010 IEP is substantively deficient and is, therefore, invalid.

The Hearing Officer concluded that the October 21, 2010 IEP was fatally flawed because: (1) the Placement Description is completely inconsistent with the pragmatic elements described in the document; (2) Present Levels of Performance, as well as Goals and Objectives, were not included for all areas where A.V.'s exceptionality negatively impacts her ability to benefit from the IEP; and (3) no regular education teacher participated in the writing of the October 2010 IEP. [Doc. 13 at 30]. The Hearing Officer thus concluded that the April 2010 IEP was the last valid IEP conducted with regard to A.V. ***Id.***

The Plaintiff argues that while a court should review an IEP for procedural compliance, technical deviations will not render an IEP invalid, unless those deviations result in substantive harm, thus constituting a denial of a free appropriate public education ("FAPE"). *See, e.g.,* ***Tice v. Botetourt County Sch. Bd.,*** 908 F.2d 1200, 1207 (4th Cir. 1990); ***Gadsby v. Grasmick,*** 109 F.3d 940, 956 (4th Cir. 1997); ***DiBuo v. Board of Educ. of Worcester County,*** 309 F.3d 184, 190 (4th Cir. 2002). However, the problems with the October 2010 IEP in the instant case are not limited to mere procedural noncompliance, such as the failure to include a general education teacher in the IEP's development, or the

9

failure to include IEP sections for Present Levels of Performance or Goals and Objectives.

As the Hearing Officer correctly identified, the fundamental problem with the October 2010 IEP is the complete and total inconsistency between the various sections of the document. The Placement section, which was completed on October 21, 2010, indicates that A.V. is to be placed in a general education environment ninety-six percent of the time, and in a special education environment only four percent of the time. [Doc. 16 at 4]. However, the Present Levels of Performance section, which the Plaintiff argues in its Motion for Summary Judgment was carried over from the April 22, 2010 IEP and incorporated into the October 21, 2010 IEP, [*see* Doc. 15 at 13-14], provides that "[t]his student will not participate with non-exceptional students in a regular classroom and/or extracurricular and non-academic activities because full participation in regular settings is limited by regular students'/teachers' inability to fluently communicate in total communication, as needed by this student for accurate receptive and expressive communication and learning tasks . . . [A.V.] needs a small group setting with continuing intensive speech therapy." [Doc. 16 at 8].

If the April 2010 IEP was adopted and incorporated into the October 2010 IEP, as the Plaintiff argues, then it is impossible to understand how the IEP Team in October of 2010 could have arrived at the conclusion that A.V. belonged in a general education setting ninety-six percent of the time. As the Hearing Officer found, "the placement selected is irreconcilable with the identified needs of the child," and "[t]he only explanation consistent with the evidence is that the October 21, 2010 IEP was created for the purpose of facilitating this Student's removal to the county school district, [as opposed to] a careful effort to create a program for her needs." [Doc. 13 at 30]. Accordingly, the Court **FINDS**

that the October 21, 2010 IEP is substantively deficient to the point of effectively denying A.V. a free appropriate public education, as mandated by 20 U.S.C. § 1412, and that the IEP completed on April 22, 2010 was therefore the last valid IEP conducted.

> **b. W. Va. Code § 18-17-1,** et seq. *is preempted by the federal IDEA to the extent that W. Va. Code § 18-17-1,* et seq. *would prevent a student from obtaining a free appropriate public education.*

W. Va. Code § 18-17-1, *et seq.*, provides that WVSDB "shall be maintained for the care and education of the deaf youth and blind youth of the state." At the present time, all special education services in West Virginia are conducted under the purview of the IDEA, as re-authorized by the United States Congress in 2004, and effective as of July 1, 2005. *See* 20 U.S.C. § 1400, *et seq.* Therefore, the IDEA was in force and applicable to all matters at all times presented by this case.

States accepting federal assistance pursuant to the IDEA, and hence subjecting themselves to the requirements of the IDEA, must provide "a free appropriate public education ("FAPE") . . . to all children with disabilities residing in the State between the ages of 3 and 21 . . . ." 20 U.S.C. § 1412. The WVDE is the agency charged with the duty to enforce the requirements of the IDEA in the public schools of West Virginia. 20 U.S.C. § 1412(a); W. Va. 126 C.S.R. 16 § 3.1, Introduction. Educational placement decisions for students with disabilities under the IDEA must be made pursuant to the student's Individualized Educational Program ("IEP"), which is a detailed evaluation of an individual student conducted pursuant to 20 U.S.C. § 1414. The IDEA requires that students with disabilities be placed "with age-appropriate non-disabled peers to the maximum extent appropriate **based on the IEP**." W. Va. 126 C.S.R. 16 § 3.1, Chapter 5, Section 2(J); *see*

11

*also* 20 U.S.C. 1412(a)(5)(A).  Placement decisions must be made individually for each student, and must be based on the student's unique needs, ***not the student's category of exceptionality***, or the availability of placement options, services, staff, or space.  126 C.S.R. 16 § 3.1, Chapter 5, Section 2(J).

In the instant case, the Hearing Officer concluded that because A.V.'s IEP calls for her to be placed in a total communication environment, her removal from WVSDB and placement at the local county school would constitute an effective denial of FAPE, because a total communication environment is incapable of replication at the county school. [Doc. 13 at 34].  To the extent that the Plaintiff argues that W. Va. Code § 18-17-1, *et seq.*, would exclude A.V. from attending WVSDB because she is not deaf, the Hearing Officer found W. Va. Code § 18-17-1, *et seq.* to be preempted by the IDEA.  ***Id.***

The Plaintiff argues, essentially, that the provisions of W. Va. Code § 18-17-1, *et seq.* and the IDEA are not in conflict, because to the extent that the IDEA requires the local county school to provide A.V. with FAPE, such services would be provided at the county school, just as they are provided at WVSDB.  To that end, the Plaintiff elicited testimony from various Hampshire County educators and school officials at the underlying due process hearing, who all testified to the effect that the county school could provide A.V. with a total communication environment.

Significant to the Court's consideration of the testimony presented at the hearing, however, is the fact that, at best, only one other individual at the county school is capable of communicating in sign language.  That individual is the school's speech therapist.  Moreover, the evidence presented at the hearing demonstrated that the speech therapist

would only be available to assist A.V. one hour per week. [Doc. 13-2 at 5]. As the Hearing Officer concluded, "[t]here is a great discrepancy between providing a teacher with signing capabilities 240 minutes per month . . . and a total communication school building where all teachers and students are familiar with signing as well as other non-verbal methods of communication." [Doc. 13 at 33].

All of these considerations compel the Court to conclude, in the same vein as the Hearing Officer, that the total communication environment mandated by A.V.'s last valid IEP, and currently accomodated at WVSDB, is not presently capable of replication in the local county school.

Because A.V.'s last valid IEP requires a total communication environment, a total communication environment constitutes a free appropriate public education for A.V. "[S]tate law is naturally preempted to the extent of any conflict with a federal statute." ***Crosby v. National Foreign Trade Council,*** 530 U.S. 363, 372 (2000). To the extent that compliance with the Plaintiff's interpretation of W. Va. Code § 18-17-1, *et seq.* would prevent A.V. from obtaining the free appropriate public education mandated by the IDEA, W. Va. Code § 18-17-1, *et seq.* is preempted in this case.

### 7. Conclusion

For the reasons stated above, this Court **FINDS** that the Plaintiff's Motion for Summary Judgment must be **DENIED**, and the Defendants' Cross-Motion for Summary Judgment must be **GRANTED**. The decision of the Hearing Officer is hereby **AFFIRMED**, and, accordingly, A.V. shall be permitted to remain in her present educational placement program located at the West Virginia Schools for the Deaf and Blind.

It is so **ORDERED**.

The Clerk is hereby directed to transmit copies of this Order to counsel of record herein.

**DATED:** May 14, 2012

_____
GINA M. GROH
UNITED STATES DISTRICT JUDGE